UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN POOLE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> HEALTHRIGHT 360, et al., <br><br> Defendants. | Case No.  25-cv-03173-JCS <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** <br><br> Re: Dkt. No. 14 |

## I.   INTRODUCTION

Plaintiffs filed this action in San Francisco Superior Court asserting wrongful death and other state law claims against Healthright 360, Healthright 360 Foundation and Healthright 360 CEO Vitka Eisen, based on the death of their adult son resulting from a fentanyl overdose that occurred while he was a resident in a treatment facility operated Healthright 360.  Defendants removed the action to this Court on the basis of diversity jurisdiction.  Presently before the Court is Defendants' Motion to Dismiss ("Motion").  A hearing on the Motion was held on June 25, 2025.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.   BACKGROUND

### A.   Allegations in the Complaint

Plaintiffs Dawn Poole and Michael Cartwright are the biological mother and father of decedent Justin Cartwright ("Justin").  Compl. ¶¶ 1-2.  Dawn Poole resides in Dublin, Ireland.  *Id.* ¶ 24.[2] Plaintiffs allege that they are Justin's heirs and successors-in-interest and that they are

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

[2] Although the complaint does not include any allegations addressing where Cartwright resides, Plaintiffs' counsel represented at the motion hearing that Cartwright is not a California resident

United States District Court
Northern District of California

personal representatives of Justin's estate.  *Id.*  ¶¶ 1-2, 4-5.  Justin was not married at the time of his death, on January 14, 2024, "and had no children other than a biological child, Samantha, who was legally adopted by her mother, Jennifer Leach and her husband."  *Id.*

Healthright 360 is a California not-for-profit entity that "has its principle [sic] headquarters at 1563 Mission St., San Francisco, CA 94103" and is "managed and operated by its chief executive officer, Vitka Eisen."  *Id.*  ¶ 7.[3]  According to Plaintiffs, Eisen "was responsible for [Healthright 360's] various residential treatment and sober living programs including but not limited to the 'Walden House,' located on 890 Hays, St[.], San Francisco, California."  *Id.*  ¶ 8. According to Plaintiffs, at the time of the relevant events, Justin "was a 30-year-old man . . . who was homeless and suffering from co-morbid conditions including substance use disorder."  *Id.*  ¶ 23.  On December 28, 2023, after he had recently been released from Madera County Jail, Justin applied for and was admitted to Healthright 360's residential treatment program.  *Id.*  ¶¶ 23, 25.

"Based on his intake screening form, [Justin] was deemed 'highly vulnerable' to relapse on substances and was placed on the program's highest of detoxification program called 'Clinically Managed High-Intensity Residential Treatment.' "  *Id.*  ¶ 26. Justin was assessed as having "Marijuana use disorder, Methamphetamine and Opioid use disorder," and to be "at high risk for Fentanyl Relapse."  *Id.*   The doctor who performed the assessment ordered "drug Monitoring, Fentanyl, with confirmation, Urine" and prescribed Narcan nasal spray in the case of overdose.  *Id.*

On December 29, 2023, the day after he entered the program, Justin overdosed on fentanyl while at Walden House, a residential treatment facility operated by Healthright 360.  *Id.*  ¶ 27. Justin "indicate[d] he relaped [sic] on drugs that were not his but which were found lying around in the facilities' bathroom stall."  *Id.*  Nonetheless, Healthright 360 "never took any corrective measures to ensure drugs left behind in plain view inside the facilities' bathrooms were

---

and there appears to be no dispute that there is complete diversity among the parties.
[3] Although Healthright 360 Foundation is named in the caption of the complaint, there are no allegations in the complaint that refer to that entity.

2

confiscated and reported to management[, ]" "fail[ing] to follow its own procedures despite Decedent's obvious relapse and that of many others . . . , and in the face of clear signs of contraband and drug[s] left in plain view to residents highly vulnerable to relapse." *Id.* ¶ 28. According to Plaintiffs, this was a violation of both "a drug confiscation policy and a search and seizure policy." *Id.*

On January 7, 2024, Justin tested positive for fentanyl, methamphetamine and cocaine. *Id.* ¶ 30. Despite this second relapse, however, Justin "was transferred from 'WM' (withdrawal management) Services to [Healthright 360's] Residential Treatment or the 'Walden House' with less supervision." Although Justin's counselor approved him for residential treatment, she recommended a "treatment level of care a[t] Level 3.5[, ] the high[est] level for clinically managed High Intensity Resident Services." *Id.* ¶ 32.[4] She also "assesse[d] him as 'highly vulnerable and likely to continue using in a dangerous manner if not admitted to RTX[5] due to longer term poly substances use, recent OD and history of over 20 DOD, recent return to use in program, caving to sue, no insight into concreate triggers to sue, loss of family support and ambivalence about treatment.' "[6]

On January 14, 2024, Justin "relapse[d] a third time" "yet his body [was] not discovered until the next morning *in full rigor* and *liver mortis*." *Id.* ¶ 33 (emphasis in original). "The investigator also discovered evidence of drug paraphernalia in plain view next to his body along with burned foil and a baggie with white powder." *Id.* ¶ 35. Plaintiffs allege that Justin "was last known to be alive at 6:00 p.m. the night prior and there is no evidence that any welfare checks required per [Healthright 360's] monitoring policies were conducted until 8:00 a.m. the next day when [Justin] had long expired." *Id.* ¶ 36.

According to Plaintiffs, Healthright 360 has a "history of neglect." *Id.* ¶¶ 38-46.

---

[4] The Court notes that the Complaint contains many typographical errors. In Paragraph 32, for example, Plaintiffs refer to Justin's "primary counsel" but appear to mean "primary counselor." Plaintiffs also describe level of care 3.5 as "the high level for clinically managed High Intensity Resident Services." Given the odd grammar, the Court assumes that Plaintiffs intended to allege that this level is the "*highest* level for clinically managed High Intensity Resident Services."
[5] The Complaint does not explain what "RTX" stands for. At the motion hearing, Plaintiffs' counsel stated that it refers to "residential treatment."
[6] It is the Court's best guess that the word "sue" in this quotation was intended to be "use."

United States District Court
Northern District of California

Plaintiffs allege that between "March 2023 [and] April 2024, four clients of [Healthright 360] and one of its employees fatally overdosed inside their San Francisco facilities." *Id.* ¶ 38. They point to interviews conducted by the San Francisco Chronicle indicating that "the facilities including the Walden house [were] nothing more than revolving doors for clients who often cycle[d] between the streets and the programs" and that Walden House was "notorious for being a place where drug use was knowingly rampant by both clients and staff, who were supposedly in charge of monitoring and caring for a vulnerable population." *Id.* ¶ 39. According to Plaintiffs, "[t]he Walden house was also known to be a 'flop house' where clients would openly consume drugs for weeks at a time, all under the guise of being treated for substance addiction." *Id.*

Plaintiffs further allege, on information and belief, that "the state of California also initiated its own investigation into the numerous overdose fatalities and came to the conclusion that many key policies intended on protecting clients and safekeeping of the programs were ignored and not followed." *Id.* ¶ 40. This included failing to provide orientations to new residents explaining the rules of the program, search residents' belongings at intake, conduct drug testing, search clients and conduct hourly monitoring. *Id.* Plaintiffs also allege that Healthright 360 seldom followed "safety measures to ensure that that [sic] the clients [were] safely stepped down from residential treatment." *Id.* ¶ 45. According to one former client, "an important but known flaw in [Healthright 360's] system . . . was [its] blatant failure to ensure clients were actually detoxified and sober prior to downgrading them from residential treatment to sober living." *Id.* ¶ 43.

Plaintiffs assert the following claims against Healthright 360 and Eisen: 1) wrongful death (Claim One); 2) neglect of a dependent adult in violation of the Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act"), Cal. Welf. & Inst. Code §§ 15610.57 & 15657 (Claim Two); 3) negligent training, supervision, and retention (Claim Three); and 4) Survival under Cal. Civ. Proc. Code §§ 377.30 *et seq.* (Claim Four).

### B. The Motion

In the Motion, Defendants bring five main challenges to Plaintiffs' claims. First, they argue that Plaintiffs lack standing to assert a wrongful death claim. Motion at 2, 7-9. Defendants

1    point to the allegation in the complaint that Justin has a surviving child, indicating that under Cal.

2    Civ. Proc. Code § 337.60(a), Plaintiffs cannot assert a wrongful death claim based on Justin's

3    death.  *Id.*  at 8.  They further assert that the complaint does not allege that Plaintiffs were

4    dependent upon Justin, which would give them standing to assert a wrongful death action under

5    Cal. Civ. Proc. Code § 337.60(b).  *Id.*  Nor does it allege facts establishing that Plaintiffs are

6    entitled to bring a wrongful death action as "personal representatives" of Justin's estate under Cal.

7    Civ. Proc. Code § 337.60, Defendants contend.  *Id.*  at 9.  According to Defendants, " 'Personal

8    Representative' means 'executor, administrator, administrator with the will annexed, special

9    administrator, successor personal representative, public administrator acting pursuant to Section

10    7660, or a person who performs substantially the same function under the law of another

11    jurisdiction governing the person's status.' "  *Id.* (citing Cal. Prob. Code § 58(a); *Adams v. Super.*

12    *Ct. (Centinella Freeman Reg. Med. Ctr.*), 196 Ca. App. 4th 71, 75 n.6 (2011)).  Defendants assert

13    that "[s]uch actors must be appointed under California law. See Cal. Prob. Code § 8400 et seq."

14    *Id.*

15        Second, Defendants contend Plaintiffs' wrongful death claim must meet the heightened

16    pleading requirements that California applies to statutory claims and that here, Plaintiffs fail to

17    meet that requirement as to the causation element of their wrongful death claim.  *Id.*  at 2, 10-11.

18    In particular, Defendants contend, Plaintiffs fail to allege Justin's cause of death with specificity,

19    alleging only that drug paraphernalia was found by his body but not actually alleging that he died

20    from an overdose.  *Id.*  at 10.  Defendants further assert that Plaintiffs do not allege specific facts

21    "connecting" Healthright 360 to Justin's death such as "what [Healthright 360's] 'monitoring

22    policies' required, or that they could have prevented Decedent's death."  *Id.*  at 10-11. Therefore,

23    Defendants assert, the Complaint fails to plead sufficient facts to establish that [Healthright 360's]

24    conduct caused Decedent's death."  *Id.* at 11 (citing *Wilkof v. Continental Cas. Co*., Case No.

25    2:21-cv-02052-MCS-DFM, 2022 WL 16859592, at *3 (C.D. Cal. May 2, 2022)).

26        Third, Defendants contend Plaintiffs fail to adequately allege their Elder Abuse Act claim

27    for neglect of a dependent adult in violation of Welf. & Inst. Code §§ 15657 *et seq.*  *Id.* at 2-3, 11-

28    13.  According to Defendants, California's heightened pleading standard applies to this claim as

well because it is a statutory claim. *Id.* at 11-12. Further, they assert, the claim requires something more than mere negligence; according to Defendants, Plaintiffs must plead facts establishing that Defendants engaged in "reckless, oppressive, fraudulent, or malicious conduct." *Id.* at 11 (citing *George v. Sonoma Cnty. Sheriff's Dept.*, No. C-08-02675 EDL, 2009 WL 656299, at *5 (N.D. Cal. Mar. 12, 2009) (quoting *Sababin v. Super. Ct.*, 144 Cal. App. 4th 81, 89 (2006)). Here, Defendants assert, Plaintiffs' claim "rests on allegations that Defendants were negligent in treating Decedent or negligently enforced their own policies, [but] this cannot sustain a claim for neglect under the Act." *Id.* at 12. According to Defendants, "California authorities provide that 'neglect under the [Elder Abuse] Act refers not to the substandard performance of medical services but, rather, to the failure of those responsible for attending to the basic needs and comforts of . . . dependent adults, regardless of their professional standing, to carry out their custodial obligations.'" *Id.* (quote *Sababin*, 144 Cal. App. 4th at 89 (quoting *Covenant Care*, 32 Cal. 4th at 783) (cleaned up)). Defendants contend the complaint's allegations that Healthright 360 "did not 'regularly conduct'" testing, did not enforce its 'drug confiscation policy and [] search and seizure policy' on the occasion of Decedent's first relapse, and did not conduct hourly welfare checks the night Decedent passed away" "mirror" allegations that "California courts have consistently found to be insufficient to state a claim for neglect" under the Elder Abuse Act. *Id.* at 12-13.

Fourth, Defendants argue that the claim for negligent training, supervision and retention fails to state a claim "because it does not allege facts sufficient to show that Defendants were on notice of the likely death of Mr. Cartwright, fails to identify which employee [had] likely cause[d] Mr. Cartwright's death, fails to allege nonconclusory facts demonstrating that Defendants should have known about particular employees likely to cause Mr. Cartwright's death, and fails to plead facts which establish the elements of negligence." *Id.* at 3, 13-14.

Fifth, Defendants argue that the survivor claim, seeking to recover "any noneconomic damages or punitive damages Decedent would have been entitled to recover had he survived[,]" fails to state a claim. *Id.* at 15. In particular, Defendants contend Plaintiffs have failed "to identify the underlying claims Decedent would have been entitled to bring had he survived." *Id.* at 15.

1    According to Defendants, the claim cannot be based on a wrongful death claim by Justin's estate

2    because "[a] person's estate can't assert a wrongful death action in California premised on that

3    same person's death." *Id.* (quoting *Est. of Serna v. County of San Diego*, No. 20-cv-2096 LAB-

4    MSB,  2021 WL 4480658, at *2 (S.D. Cal. Sept. 30, 2021) (quoting *Quiroz v. Seventh Ave. Ctr.*,

5    140 Cal. App. 4th 1256, 1263 (2006))).  To the extent the claim is based on other tort claims,

6    Defendants assert, the claim fails to provide notice of what those torts might be.  *Id.*  Defendants

7    argue that "[w]ithout a more definite statement of the underlying claims to this cause of action,

8    Plaintiffs and Decedent's estate are not entitled to proceed."  *Id.*

9        Finally, Defendants assert that all claims against Healthright 360 Foundation must be

10    dismissed because there are no allegations about that defendant in the Complaint.  *Id.*  at 14-15.

## III.    ANALYSIS

### A.    Legal Standards Under Rule 12(b)(6)

13        A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure

14    for failure to state a claim on which relief can be granted.  "The purpose of a motion to dismiss

15    under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

16    *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage

17    is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

18    sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

19    that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

20        In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

21    takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

22    non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A

23    complaint must "contain either direct or inferential allegations respecting all the material elements

24    necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550

25    U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.

26    1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements

27    of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

28    550 U.S. at 555).  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff

must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

**B.    Whether Plaintiffs Have Standing to Assert Wrongful Death Claim**

**1.  Legal Standards**

"In California, an action for wrongful death is governed solely by statute, and the right to bring such an action is limited to those persons identified therein." *Est. of Swindell v. Cnty. of Sonoma*, No. 15-CV-897-SC, 2015 WL 6177743, at *6 (N.D. Cal. Oct. 21, 2015) (quoting *Scott v. Thompson*, 184 Cal.App.4th 1506, 1510 (2010)).  Standing to sue under California law is governed by Cal. Civ. Proc. Code § 377.60 ("the Wrongful Death Statute").  That section provides, in relevant part, as follows:

> A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:
>
> (a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. If the parents of the decedent would be entitled to bring an action under this subdivision, and the parents are deceased, then the legal guardians of the decedent, if any, may bring an action under this subdivision as if they were the decedent's parents.
>
> (b)(1) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, parents, or the legal guardians of the decedent if the parents are deceased.
>
> . . .

Cal. Civ. Proc. Code § 377.60(a), (b).

Because the word "children" in subdivision (a) is not defined, California courts have "looked to Probate Code section 6451, which governs the effect of an adoption on the parent and child relationship." *Phraner v. Cote Mart, Inc.*, 55 Cal. App. 4th 166, 169 (1997). Section 6451 provides, in relevant part:

> (a) An adoption severs the relationship of parent and child between an adopted person and a natural parent of the adopted person unless both of the following requirements are satisfied:

(1) The natural parent and the adopted person lived together at any time as parent and child, or the natural parent was married to or cohabiting with the other natural parent at the time the person was conceived and died before the person's birth.

(2) The adoption was by the spouse of either of the natural parents or after the death of either of the natural parents.

. . .

Cal. Prob. Code § 6451(a).  Thus, where a natural parent never lived with the adopted person and did not live with the other natural parent at the time the adopted person was conceived and die before the adopted person's birth, adoption severs the parent child relationship for the purposes of the wrongful death statute. However, because a wrongful death claim accrues at the time of the decedent's death, a child's subsequent adoption does not terminate his or her right to bring a wrongful death suit.  *Rich v. Taser Int's, Inc.*, No. 09-cv-02450-ECR-RJJ,  2012 WL 4490845, at *4 (D. Nev. Sept. 26, 2012) (citing, *inter alia*, *Pillsbury v. Title Ins. & Trust Co.*, 175 Cal. 454, 166 P. 11, 14 (Cal.1917)).

It is the plaintiff's burden to establish standing to bring a wrongful death claim.  *Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165, 188 (2015), as modified (Aug. 20, 2015).

## 2.  Discussion

In their Opposition, Plaintiffs do not dispute that they have not alleged facts that would establish standing as Justin's personal representatives or as his dependents under the Wrongful Death Statute.[7]  Nonetheless, they assert that they have standing to bring a wrongful death claim

---

[7] At the hearing, Plaintiffs conceded that they were not dependent upon Justin.  They did not concede that they are not personal representatives of Justin's estate.  However, the only support Plaintiffs' counsel pointed to in support of the assertion that Plaintiffs are personal representatives were the declarations Plaintiffs filed in this case stating that they are Justin's successor in interest under Section 377.11 of the California Code of Civil Procedure.  *See* dkt. nos. 12, 13.  Those declarations do not establish that either Plaintiff falls under the definition of "personal representative" under Cal. Prob. Code section 58(a), which provides:

(a) "Personal representative" means executor, administrator, administrator with the will annexed, special administrator, successor personal representative, public administrator acting pursuant to Section 7660, or a person who performs substantially the same function under the law of another jurisdiction governing the person's status.

Cal. Prob. Code § 58(a).  Nor have Plaintiffs alleged any facts establishing that they have been

1    based on their son's death because the requirement in Section 6451(a)(1) is not met and therefore,

2    the exception to the rule that adoption cuts off the parental relationship does not apply.

3    Opposition at 3-5.  In particular, they represent that "Decedent and his daughter never lived

4    together at any time as parent and child and Decedent was not married to or cohabitating with the

5    other natural parent  . . . at the time [their child]  was conceived" and "[Decedent] did not die

6    before the her [sic] birth."  *Id.* at 5.

7           As these facts are not alleged in the Complaint, the Court finds that they cannot be

8    considered in evaluating the sufficiency of the complaint, which the Court finds fails to

9    sufficiently allege that Plaintiffs have standing to assert a wrongful death claim.  Based on

10   Plaintiffs' representation, however, it appears that they may be able to cure this deficiency by

11   amendment.  Therefore, the Court DISMISSES the wrongful death claim with leave to amend to

12   allege facts sufficient to establish standing.  These facts should include not only allegations

13   establishing that the exception in Section 6541(a) does not apply but also facts establishing that

14   the adoption occurred *before* Justin's death.  **In amending their complaint, Plaintiffs should be**

15   **mindful of the privacy protections contained in Rule 5.2 of the Federal Rules of Civil**

16   **Procedure, which requires that minors be referred to by their initials only.**[8]

17       **C.**    **Whether the Wrongful Death Claim is Adequately Pled as to Causation**[9]

18             **1.**  **Legal Standards Governing Wrongful Death Claim**

19         To prevail on their wrongful death claim, Plaintiffs must establish that Justin's death was

20   "caused by the wrongful act or neglect of another."  Cal. Civ. Proc. Code § 377.60.  To do so,

21   Plaintiffs must satisfy each of the elements of a claim for negligence, which are:  "(1) defendant's

22   obligation to conform to a certain standard of conduct for the protection of others against

23

United States District Court
Northern District of California

_____

24   appointed to serve as personal representatives.  *See* Cal. Prov. Code §§ 8400-8405 (governing
25   appointment of personal representative).  Therefore, Plaintiffs have not adequately alleged
   standing on the basis that they are personal representatives of Justin's estate.  Plaintiffs may
26   amend to allege facts to establish, if they can, that they are personal representatives of the estate.
   [8] The Court notes that Plaintiffs have violated this rule twice, in the now-withdrawn Amended
27   Complaint (dkt. no. 27) and in their Opposition brief (dkt. no. 19).  The Court has placed both
   documents under seal to protect the privacy of the Decedent's minor child.
28   [9] The Court reaches this issue even though it has found that Plaintiffs' have not adequately alleged
   standing because Plaintiffs may be able to cure this shortcoming by amendment.

unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008)).  Usually, "proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint." *Gomez v. Cnty. of Los Angeles*, No. 221CV03708RGKPDX, 2022 WL 886446, at *4 (C.D. Cal. Jan. 5, 2022) (citing *Weissich v. Cnty. of Marin*, 224 Cal. App. 3d 1069, 1084 (1990)). "But 'where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' " *Id.* (quoting *Weissich*, 224 Cal. App. 3d at 1084).

### 2. Applicable Pleading Standard

Defendants contend Plaintiffs are required to plead causation with specificity, because "[w]rongful death is a statutory claim, *Mayerhoff v. Kaiser Found. Health Plan, Inc*., 138 Cal. Rptr. 319, 321 (Ct. App. 1977), and statutory claims must be plead with specificity, *Lopez v. S. Cal. Rapid Transit Dist*., 710 P.2d 907, 916 (Cal. 1985)."  Motion at 9.  Defendants are incorrect. It is true that under California law, there is a "general rule that statutory causes of action must be pleaded with particularity."  *Covenant Care, Inc. v. Superior Ct*., 32 Cal. 4th 771, 790 (2004). However, under the *Erie* doctrine, "[p]leading in federal court is governed by Federal Rules of Civil Procedure, not state pleading requirements." *Miller v. Sawant*, 18 F.4th 328, 337 (9th Cir. 2021) ("Under the *Erie* doctrine . . . it is long since settled that federal courts sitting in diversity apply state substantive law and federal procedural law.") (citations omitted).  Therefore, the Court finds that Plaintiffs need only satisfy the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure to adequately allege their wrongful death claim.[10]

### 3. Whether Plaintiffs Have Sufficiently Alleged Causation

Defendants contend Plaintiffs have not sufficiently pled causation as to their wrongful

---

[10] Defendants cite to a single case decided by a federal district court in which the court appears to have applied California's heightened pleading requirement to a California statutory claim.  *See* Motion at 2 (citing *Est. of Carter v. Cambridge Sierra Holdings, LLC*, No. 5:21-CV-01428-AB-SPX, 2023 WL 8351512, at *14 (C.D. Cal. Oct. 20, 2023)).  The Court does not find that authority persuasive, however, as the court in that case did not address the *Erie*  doctrine or explain why it did not apply to the rule under California law that statutory claims must be pled with specificity.

United States District Court
Northern District of California

death claim because: 1) Plaintiffs do not plead Justin's "actual cause of death with any specificity"; and 2) Plaintiffs do not plead specific facts connecting Healthright 360's actions with Justin's death, such as the type of monitoring policies that would have prevented Justin's death. Defendants' arguments are unpersuasive.

First, as discussed above, Plaintiffs do not need to meet the heightened pleading requirement that would apply to this claim in State court. Even if they did, however, their pleadings would be sufficient. Defendants' assertion that Plaintiffs failed to sufficiently allege that Justin died of a drug overdose is contradicted by the allegations in the Complaint, in which Plaintiffs allege that "on January 14th, CARTWRIGHT relapses a third time yet his body is not discovered until the next morning in full rigor and liver mortis." Compl. ¶33. Drawing all reasonable inferences in Plaintiffs' favor, as is required on a motion to dismiss under Rule 12(b)(6), this allegation is sufficient to give rise to a plausible inference that Justin died of a drug overdose.

Second, the Complaint contains extensive allegations linking Defendants' actions and omissions to Justin's death, including allegations that: 1) Justin overdosed on December 29, 2023 on drugs he said he found loose in the bathroom at Defendants' facility but that no corrective action was taken to determine the source of the drugs or to confiscate them, Compl. ¶¶ 27-28; 2) five days before his death Justin was transferred to a lower level of care "with less supervision despite having relapsed just three days [before] and requir[ing] continued withdrawal management and a greater level of monitoring," *id.* ¶ 31; and 3) Justin "was last known to be alive at 6:00 p.m. the night prior and there [was] no evidence that any welfare checks required per [Healthright 360's] monitoring policies were conducted until 8:00 a.m. the next day when [Justin] had long expired." *Id.* ¶ 36. These allegations are sufficient to give rise to a plausible inference that Justin's drug overdose was caused by Defendants' failure to ensure that illegal drugs were not freely available to him while he was receiving treatment in their facilities and failure to adequately monitor him despite his known high risk of relapse.

Defendants' reliance on *Wilkof v. Contintental Cas. Co.*, No. 221CV02052MCSDFM, 2022 WL 16859592 (C.D. Cal. May 2, 2022) in support of their causation argument, *see* Motion at

11, is misplaced because the facts of that case are distinguishable.  In *Wilkof*, the decedent had accidentally overdosed after his long-term care insurance carrier had denied continued coverage of residential treatment and his heirs brought a wrongful death claim against the insurance company. 2022 WL 16859592, at *1-2. His heirs alleged that the decedent "began drinking, taking antidepressants, and taking pain medication to allay his severe emotional distress and depression" associated with his impending eviction from the residential facility and that this led to his accidental overdose.  *Id.* But the court found that there were "no pleaded facts that establish that [the insurance company] was aware Decedent had begun drinking, taking antidepressants, and taking pain medication to cope with his severe emotional distress, nor how it could have been foreseeable to [the insurance company] that Decedent would engage in these activities, let alone that he was in danger of an accidental overdose."  *Id.*  at *3.  It further found that the plaintiffs "fail[ed] to plead facts demonstrating how [the insurance company's] claim denial would have caused Decedent's death on its own."  *Id.*

Here, in contrast to *Wilkoff*, the allegations in the Complaint make clear that Defendants were aware that Justin was at extremely high risk of relapse and were on notice that illegal drugs were available within the facility.  Plaintiffs also alleged that Healthright 360 did not follow its own policies with respect to monitoring, failing to perform a welfare check for approximately 12 hours, during which time Justin died.  Given that the previous overdose, on December 29, 2023, was alleged to have been reversed through the administration of Narcan, the complaint raises a plausible inference that had Defendants performed regular welfare checks, as required by their own policies, they could have reversed the effects of the drugs and saved Justin's life.   In short, the facts alleged here give rise to a more direct link between Justin's death and Defendants' conduct than the facts in *Wilkof*.

Therefore, the Court concludes that Plaintiffs have adequately alleged the causation element of their wrongful death claim.

### D.    Whether Claim for Adult Neglect is Adequately Pled

#### 1.  Legal Standards

To prevail on a claim under the Elder Abuse Act, a plaintiff must demonstrate "by clear

United States District Court
Northern District of California

1  and convincing evidence that a defendant is liable for physical abuse as defined in Section

2  15610.63, or neglect as defined in Section 15610.57, and that the defendant has been guilty of

3  recklessness, oppression, fraud, or malice in the commission of this abuse . . . ."  Cal. Welf. &

4  Inst. Code § 15657.   As relevant here, neglect is defined as "[t]he negligent failure of any person

5  having the care or custody of an elder or a dependent adult to exercise that degree of care that a

6  reasonable person in a like position would exercise."  Cal. Welf. & Inst. Code § 15610.57(a)(1).  It

7  includes "the failure to assist in personal hygiene, or in the provision of food, clothing, or shelter;

8  the failure to provide medical care for physical and mental health needs; the failure to protect from

9  health and safety hazards; and the failure to prevent malnutrition or dehydration." *Sababin v.*

10 *Superior Ct.*, 144 Cal. App. 4th 81, 88 (2006) (citing Cal. Welf. & Inst. Code § 15610.57).

11 "Recklessness refers to a subjective state of culpability greater than simple negligence, which has

12 been described as a deliberate disregard of the high degree of probability that an injury will

13 occur." *Id.* at 89 (internal quotations and citations omitted).  "Oppression, fraud and malice

14 involve intentional or conscious wrongdoing of a despicable or injurious nature." *Id.*

15        California courts have held that the Elder Abuse Act "excludes liability for acts of

16 professional negligence." *Id.* at 88 (citing Cal. Welf. & Inst. Code § 15657.2; *Delaney v. Baker,* 20

17 Cal.4th 23, 32 (1999)).  The California Supreme Court explains;

18              [N]eglect refers not to the substandard performance of medical
              services but, rather, to the "failure of those responsible for attending
19            to the basic needs and comforts of elderly or dependent adults,
              regardless of their professional standing, to carry out their custodial
20            obligations." . . . Thus, the statutory definition of "neglect" speaks not
              of the undertaking of medical services, but of the failure to provide
21            medical care.

22 *Covenant Care, Inc. v. Superior Ct.*, 32 Cal. 4th 771, 783 (2004) (citing *Delaney*, 20 Cal.4th at p.

23 34).

24        Drawing a distinction between "neglect" that is actionable under the Elder Abuse Act and

25 professional negligence, which is not, may be difficult as to "health care institutions, such as

26 nursing homes, [that] perform custodial functions *and* provide professional medical care."

27 *Delaney*, 20 Cal. 4th 23, 34 (1999). "When, for example, a nursing home allows a patient to suffer

28 malnutrition," this could be considered "professional negligence" as it reflects "the inability of

14

nursing staff to prescribe or execute a plan of furnishing sufficient nutrition to someone too infirm to attend to that need herself." *Id.* "But such omission is also unquestionably 'neglect,' as that term is defined" in the Elder Abuse Act. *Id.* The *Delaney* court explained, "Section 15657 provides the way out of this ambiguity: if the neglect is 'reckless,' or done with 'oppression, fraud or malice,' then the action falls within the scope of section 15657 and as such cannot be considered simply 'based on ... professional negligence' within the meaning" of the Elder Abuse Act. *Id.* at 35.

The *Delaney* court rejected the broad reading of the professional negligence exclusion advanced by the defendant in that case, which argued "that the term 'based on . . . professional negligence,' used in section 15657.2, applies to any actions directly related to the professional services provided by a health care provider." *Id.* The court reasoned:

> The adoption of such a position would produce an anomalous result. It would make the determination as to whether the "recklessly neglectful" custodians of an elderly person were subject to section 15657 turn on the custodian's licensing status: A custodian who allowed an elder or dependent adult in his or her care to be become malnourished would be subject to 15657's heightened remedies only if he or she was not a licensed health care professional. There is no indication that the Legislature intended this anomaly.
>
> . . .
>
> From [the] legislative history, it appears clear that both the Legislature that enacted Senate Bill No. 679 and the opponents of Senate Bill No. 679 understood that one of the major objectives of this legislation was the protection of residents of nursing homes and other health care facilities. It is contrary to this objective to then read the phrase "based on ... professional negligence'" found in section 15657.2 to mean that nursing homes or other health facilities are largely exempt from liability under section 15657 for the heightened remedies to which custodians who are not health care professionals are subject.

*Id.* at 35, 37. Thus, the Court in *Delaney* concluded that the "professional negligence" exclusion under the Elder Abuse Act should be read "narrowly." *Id.* at 40.

Applying these principles, the court in *Sababin* found that there were triable issues as to whether a residential care facility's employees "acted with recklessness, oppression or malice when they failed to follow the care plan [the facility] [had] established for maintaining the health of [the plaintiff's] skin[,]" resulting in a skin infection from which she died. *Sababin*, 44 Cal.

United States District Court
Northern District of California

App. 4th at 84.  The court in *Fenimore v. Regents of Univ. of California* summarized *Sababin* as follows:

> In [*Sababin*], the court found a triable issue of fact on recklessness when the defendant rehabilitation center had established but failed to follow a care plan of monitoring a patient's skin daily and reporting changes to a physician for treatment orders. . . The rehabilitation center had cared for the patient continuously for approximately three years when she was admitted to an emergency room and severe skin conditions were discovered. . . . The pertinent neglected care plan had been in place for approximately three months when the severe conditions were discovered. . . . The rehabilitation center had no skin condition reports on the patient, and no one at the center had notified her physician of the need for a treatment order. The court held the trier of fact could infer reckless failure to provide medical care from this "significant pattern" of ignoring the care plan: "[I]f a care facility knows it must provide a certain type of care on a daily basis but provides that care sporadically, or is supposed to provide multiple types of care but only provides some of those types of care, withholding of care has occurred. In those cases, the trier of fact must determine whether there is a significant pattern of withholding portions or types of care. A significant pattern is one that involves repeated withholding of care and leads to the conclusion that the pattern was the result of choice or deliberate indifference." . . . Put otherwise, recklessness may be inferred when the neglect recurs in a significant pattern.

245 Cal. App. 4th 1339, 1349 (2016) (citing *Sababin*, 144 Cal.App.4th at pp. 85–90).

### 2.  Discussion

Defendants contend Plaintiffs' claim under the Elder Abuse Act fails because Plaintiffs have not met California's heightened pleading standard for statutory claims and furthermore, Plaintiffs have, at most, alleged "substandard performance of medical services," which is not actionable under *Sababin*  and *Covenant Care*.  Motion at 11-12.  They further assert that "allegations that a facility 'was chronically understaffed, and did not adequately train the staff it did have'—even when pled in conjunction with knowledge that these conditions make injury more likely—are insufficient to survive a motion to dismiss."  *Id.*  at 12 (quoting *Worsham v. O'Connor Hosp.*, 226 Cal. App. 4th 331, 338 (2014) (quoting *Delaney v. Baker*, 20 Cal. 4th 23, 34 (1999)). The Court rejects these arguments. First, the Court finds that the applicable pleading standard is the standard found in Rule 8 of the Federal Rules of Civil Procedure, and not the heightened pleading standard that applies to California statutory claims in state court, for the reasons stated above.  Second, the court finds that Defendants' reliance on *Worsham* is misplaced.

1    In *Worsham*, the plaintiff ("Ms. Worsham") was discharged to a transitional care facility

2    after hip surgery to treat a fractured hip and while in the facility's care suffered a fall that resulted

3    in a broken arm and refracturing her hip.  226 Cal. App. 4th at 334. The plaintiff asserted a claim

4    under the Elder Abuse Act, alleging as follows:

> [The facility] was required to maintain specific staff-to-patient ratios
> to address the needs of patients and to ensure compliance with state
> and federal law. [The facility] was chronically understaffed, and did
> not adequately train the staff it did have. The allegations include the
> fact that [the facility] was aware that Ms. Worsham had a risk of
> falling, and failed to have the proper staffing in place to prevent Ms.
> Worsham's fall. As a result of [the facility's] insufficient staffing, Ms.
> Worsham suffered a fall that resulted in a broken arm and a rebreak
> of her right hip.

10   *Id.* at 338. The court held that these allegations were "not sufficient to render [the facility's]

11   conduct in failing to provide adequate staffing anything more than professional negligence. The

12   allegations, if true, demonstrate [the facility's] negligence in the undertaking of medical services,

13   not a 'fundamental f]ailure to provide medical care for physical and mental health needs.'" *Id.*

14   (quoting *Delaney*, 20 Cal. 4th at 34) (internal quotations omitted).

15   Here, Plaintiffs' allegations are not based on Healthcare 360's understaffing at all; rather,

16   Plaintiffs have included extensive allegations that Healthcare 360 failed to protect Justin's safety

17   and has a history of neglect of client safety.  *See* Compl. ¶¶ 23-46.  These allegations, which

18   suggest a pattern of neglecting the safety of Healthright 360 clients, are sufficient to raise a

19   plausible inference that Defendants' conduct was reckless and therefore does not fall under the

20   professional negligence exception under the Elder Abuse Act.  *See Fenimore v. Regents of Univ.*

21   *of California*, 245 Cal. App. 4th 1339, 1350 (2016) (distinguishing *Worsham* and observing,

22   "*Worsham*'s determination that understaffing constitutes no more than negligence may be true,

23   *absent* further allegations showing recklessness" and that a "knowing pattern" of violations may

24   constitute recklessness) (emphasis in original).  Therefore, the Court finds that Plaintiffs' claim

25   under the Elder Abuse Act is adequately pled.

26

27

28

**E.    Whether Negligent Training, Supervision and Retention Claim is Adequately Pled**

**1.  Legal Standards**

"Ordinarily, '[a]n employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit.'" *Dent v. Nat'l Football League*, 902 F.3d 1109, 1121–22 (9th Cir. 2018) (quoting *Phillips v. TLC Plumbing, Inc.*, 172 Cal.App.4th 1133 (2009) (quotation omitted)). To prevail on such a claim, a plaintiff must demonstrate the elements of negligence: duty, breach, proximate causation, and damages. *Id.* at 1122. "There are 'two elements necessary for a duty to arise in negligent hiring and negligent retention cases—the existence of an employment relationship and foreseeability of injury.'" *Id.* (quoting *Phillips*, 172 Cal. App. 4th at 870–71 (internal quotations and citations omitted).

"Liability [for negligent training, supervision and retention] may be imposed 'either on the basis of . . . action—for example, the negligent hiring of an agent—or . . . inaction—for example, the failure to provide adequate supervision of the agent's work." *Trout v. Cnty. of Madera*, No. 122CV00867ADASAB, 2023 WL 3994932, at *28 (E.D. Cal. June 14, 2023), report and recommendation adopted, No. 122CV00867ADASAB, 2023 WL 5516278 (E.D. Cal. Aug. 25, 2023) (quoting *Far West Financial Corp. v. D & S Co.*, 46 Cal.3d 796, 812 (1988)).  However, negligence liability requires that the employer "knew or should have known that hiring the employee created a particular risk or hazard and that particular harm then materializes[;]" or that the employer knew that the employee "was a person who could not be trusted to act properly without being supervised." *Id.* (citing *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006); *Juarez v. Boy Scouts of Am.*, 81 Cal. App. 4th 377, 395 (2000) (quoting *Noble v. Sears, Roebuck & Co.*, 33 Cal. App. 3d 654, 664 (1973))). "Thus, to state a cause of action for [negligent training, supervision and retention], a plaintiff must allege facts to show that the defendant was on notice that the employee was likely to cause harm before the harm occurs." *Id.* (citing *Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133, 1139–40 (2009)).

**2.  Discussion**

Defendants assert Plaintiffs' claim for negligent training, supervision and retention fails to state a claim because the allegations in the complaint are conclusory and insufficient.  Motion at

13 (citing *Trout*, 2023 WL 3994932, at *29).  They further assert that the claim is insufficiently

pled because it "fails to allege that any individual Defendant, or any employee of a Defendant, was

on notice of the likely death of Decedent" and "fails to identify which employee or employees

Defendants should have known would cause that death." *Id.* at 13-14 (citing *Trout*, 2023 WL

3994932, at *28-29;  *Lee v. Delta Air Lines Inc.*, Case No.: CV 20-8754-CBM-(JEMx), 2021 WL

4527995, at *9 (C.D. Cal. Aug. 23, 2021)).  In addition, Defendants argue that Plaintiffs have not

adequately alleged causation. The Court finds that while Plaintiffs' allegations in support of this

claim are somewhat conclusory, they are sufficient to state a claim.

The main substantive allegations in the complaint in support of the negligent training,

supervision and retention claim are found in paragraphs 70 and 71, which allege as follows:

> 70.  . . . defendant provided inadequate training, supervision and retention of the staff responsible for monitoring, conducting welfare check, enforcing drug relapse policy, enforcing random drug testing, and regular drug testing, downgrading residential treatment residents to rehab. Additionally, upon information and belief, HR360 administrators including EISEN and DOES 1-20 were responsible themselves for managing, operating and supervising other staff at the HR360 facility.
>
> 71. Defendant HR360 as a licensed drug and alcohol residential treatment facility with the State of California, had reporting obligation to report resident overdoses at their facility. However, non-fatal overdoses, although not required to be reported are documented by HR360 and directly places it on notice of its lack of supervision and oversight which directly resulted into the numerous violations as indicated above.

Compl. ¶¶ 70-71.  Plaintiffs also point to Paragraph 26, which they contend shows that the injury

that resulted from the lack of supervision and oversight was foreseeable.  Opposition at 10.  There,

Plaintiffs allege:

> 26. Based on his intake screening form, CARTWRIGHT was deemed "highly vulnerable" to relapse on substances and was placed on the program's highest of detoxification program called "Clinically Managed High-Intensity Residential Treatment". While at HR360'sIntegrated Care Center Clinic, he was noted to have Marijuana use disorder, Methamphetamine and Opioid use disorder, Severe in remissions. Dr. Jacintho assesses him to "at high risk for Fentanyl Relapse as his last use was in September, *even in the setting of Detox and Rehab*". He orders "drug Monitoring, Fentanyl, with confirmation, Urine" and Narcan nasal spray with instructions to "Spray into the nostril as needed for opioid reversal Spray into nostril

United States District Court
Northern District of California

> in case of overdose. Repeat if needed. Call 911 for indications: decrease in rate and depth of breathing due to opioid drug.

Compl. ¶ 26 (emphasis in original).

The Court finds that these allegations are sufficient to establish the existence of a duty and breach of that duty as Plaintiffs have alleged that the omissions listed in Paragraph 70 were by employees of Healthright 360 and have also alleged specific facts indicating that it was foreseeable that these omissions – including failure to monitor, conduct regular drug testing and perform regular welfare checks, would (and did) result in injury to Justin. In particular, the complaint alleges that as Defendants' own doctor had assessed Justin as being at high risk of relapse "even in the setting of [d]etox and [r]ehab." Compl. ¶ 26. Further, for the reasons discussed above in connection with Plaintiffs' wrongful death claim, the Court finds that these allegations are sufficient to raise a plausible inference of causation.

Defendants rely on *Trout* in support of their assertion that Plaintiffs are required to identify specific employees who knew or should have known that Justin was likely to be injured by the alleged negligence. But the facts of *Trout* are distinguishable from the facts here. In that case, a victim of domestic violence was murdered while receiving assistance from the County and a domestic violence organization affiliated with the County ("CAPMC") after an employee of an independent health care provider ("Camarena") called her abusive husband to leave an appointment reminder about his wife's appointment and provided details of an upcoming appointment. 2023 WL 3994932, at *1-3. The husband then waited for his wife to leave the appointment and shot her to death. *Id.* The plaintiff asserted a negligent hiring, training and supervision claim against the County, Camarena and CAPMC, but the Court observed that the facts alleged were "boilerplate" and did "not seem to apply" to CAPMC:

> For example, Plaintiffs allege all three Defendants had a duty to train and supervise their agents and employees "to avoid disclosing the whereabouts of people like [the victim] to abusive spouses, to avoid disclosing private information including healthcare information, ...." . . ., but this allegation does not apply to CAPMC because Plaintiffs do not [allege that] any employee of CAPMC disclosed [the victim's] information to [the abuser].

2023 WL 3994932, at *29. Further, although the complaint contained conclusory allegations about

a CAPMC supervisor, Ms. Rodriguez, who was allegedly fired after the murder for "incompetence" and "dishonesty," it "did not identify what particular problematic behavior or actions by Ms. Rodriguez resulted in the specific harm of [the victim's] death." *Id.* Nor did it allege any facts suggesting CAPMC had prior knowledge of any problematic behavior by Ms. Rodriguez – or any other CAPMC employee. *Id.* Therefore, the court found that the negligent training supervision and retention claim against CAPMC was insufficiently pled. *Id.*

Here, in contrast to *Trout*, the nature of the problematic conduct by Healthright 360 employees is identified in the complaint and linked to the overdose that led to Justin's death, as discussed above. The allegations here are also sufficient to demonstrate that the injury was foreseeable to Defendants, unlike in *Trout*. While Plaintiffs have not identified *specific* employees whose omissions led to Justin's death, the Court finds that that level of detail is not required at the pleading stage of the case. *See A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 872 (2012)(holding that claim for negligent training and supervision and retention was sufficiently pled, even though it did "not identify by name or position the [defendant's] 'employees, administrators and/or agents' who allegedly failed to 'properly hire, train and supervise [the employee who injured the plaintiff]'" and that at the pleading stage, the plaintiff was not required to specify "which of the defendant's employees committed the negligent acts or omissions"). While Plaintiffs will be required to offer more detailed facts in connection with this claim at a later stage of the case, after they have had the opportunity to conduct discovery, their allegations are sufficient to raise a plausible inference as to the elements of this claim. Therefore, the Court finds that Plaintiffs' complaint states a claim for negligent training, supervision and retention.

### F.    Whether Survivor Claim is Adequately Pled

"Unlike a cause of action for wrongful death, a survivor cause of action is not a new cause of action that vests in the heirs on the death of the decedent." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1264 (2006). "It is instead a separate and distinct cause of action which belonged to the decedent before death but, by statute, survives that event." *Id.* The survivor statutes merely prevent the abatement of the injured person's cause of action; they do not "create a cause of action." *Id.* As a general rule, "the damages recoverable by a personal representative or

United States District Court
Northern District of California

successor in interest on a decedent's [survivor] cause of action are limited by statute to 'the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and *do no*t include damages for pain, suffering, or disfigurement.'" *Id.* (quoting Cal. Civ. Proc. Code § 377.34) (italics added in *Quiroz*). However, "there is at least one exception to the rule that damages for the decedent's predeath pain and suffering are not recoverable in a survivor action[,]" namely,  where a plaintiff establishes neglect under the Elder Abuse Act. *Id.* The court in *Quiroz* explains, "[t]he ability of the decedent's successor in interest to recover damages for the decedent's predeath pain, suffering, or disfigurement under [Welf. & Inst.Code., § 15657, subd. b] specifically trumps the general prohibition on such recovery provided at Code of Civil Procedure section 377.34." *Id.*

Here, Plaintiffs contend in their Opposition brief that their survivor claim is based on negligence, pointing to the allegation that "Defendants' negligence was a substantial factor in causing the Decedent's death."  Opposition at 11 (quoting Compl. ¶ 79).  It is well-established, however, that a survivor claim may not be based on the decedent's own death, as a wrongful death claim is vested in the decedent's heirs. *Est. of Serna v. Cnty. of San Diego*, No. 20CV2096-LAB-MSB, 2021 WL 4480658, at *2 (S.D. Cal. Sept. 30, 2021) (holding that "a person's estate can't assert a wrongful death action in California premised on that same person's death" because "[a] wrongful death cause of action is vested in the decedent's heirs,' not the estate") (quoting *Quiroz*, 140 Cal. App. 4th at 1263). Therefore, as currently pled, Plaintiffs fail to state a viable survivor claim.  As Plaintiffs may be able to state such a claim under the Elder Abuse Act, however, they will be given leave to amend this claim.

### G.    Whether Healthright 360 Foundation Should be Dismissed

Plaintiffs did not address in their Opposition brief Defendants' request for dismissal of Healthright 360 Foundation.  At the motion hearing, they conceded that at this time they are not aware of any specific facts that would support liability in this case as to Healthright 360 Foundation.  Accordingly, the Court dismisses that defendant.

1

**IV.     CONCLUSION**

2

For the reasons stated above, the Motion is GRANTED in part and DENIED in part.  The

3

Motion is GRANTED as to Plaintiffs' claims for wrongful death (Claim One) and survival (Claim

4

Four), which are dismissed with leave to amend.  The Court also dismisses Defendant Healthright

5

360 Foundation.  The Motion is DENIED as to Plaintiffs' claims for Adult Neglect (Claim Two)

6

and Negligent Training, Supervision and Retention (Claim Three). Plaintiffs' amended complaint

7

shall be filed by **August 6, 2025**.  The Court FURTHER ORDERS that Plaintiffs, no later than

8

**July 14, 2025**, shall file a redacted public version of their Opposition brief, dkt. no. 19, which

9

replaces the name of Justin's minor child with initials, as required under Rule 5.2 of the Federal

10

Rules of Civil Procedure.  **Plaintiffs may not use the full name of Justin's minor child in any**

11

**public filing in this case**.

12

**IT IS SO ORDERED.**

13

14

Dated: July 7, 2025

15

16

_____

JOSEPH C. SPERO
United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California