THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN: 256535)
Jeffrey Mikel, Esq. (SBN 350671)
5100 Campus Dr., Suite 200
Newport Beach, CA 92660
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Email: Cameron@sehatlaw.com

Attorney for Plaintiff, G. P.,
by her mother and guardian ad
litem Samantha Pierson

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| G. P., by her mother and guardian ad litem Samantha Pierson, individually and as a Successor in Interest of the Estate of JUSTIN CARTWRIGHT, <br><br> Plaintiff, <br><br> vs. <br><br> HEALTHRIGHT 360, a California Domestic Non-Profit organization and doing business as HEALTHRIGHT 360, VITKA EISEN, individually and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No.: 3:25-cv-03173-JCS <br><br> **FIRST AMENDED COMPLAINT** <br><br> 1. **WRONGFUL DEATH (C.C.P. §377.60)** <br> 2. **NEGLECT OF A DEPENDENT ADULT PER W&I CODE §15610.57 & 15657** <br> 3. **NEGLIGENT TRAINING, SUPERVISION AND RETENTION** <br> 4. **SURVIVAL (C.C.P. §377.30)** <br><br> **DEMAND FOR JURY TRIAL** |

## GENERAL ALLEGATIONS

1. Plaintiff, G. P., an infant through her mother and proposed guardian ad litem, Samantha Pierson, is the daughter of Decedent Justin Cartwright and is his sole heir under the law of intestacy and his successor in interest.

2. Decedent Justin Cartwright died on January 14, 2024 in the manner described below.

-1-

3.  Defendant Healthright 360., at all relevant times to this complaint was doing business as "Healthright 360", hereinafter referred to as "HR360", with principal headquarters at 1563 Mission St., San Francisco, CA 94103, is a California not-for-profit entity, and upon information and belief is managed and operated by its chief executive officer, Vitka Eisen.

4.  Defendant Vitka Eisen, hereinafter referred to as "EISEN", at all times relevant to this complaint, was the chief executive officer of Healthright360 and acting within his scope of employment as a CEO of Healthright 360. EISEN was responsible for Healthright 360's various residential treatment and sober living programs including but not limited to the "Walden House", located on 890 Hays, St, San Francisco, California. Specifically, she was in charge of ensuring that the various programs were in compliance with state laws, that policies regarding the management and treatment of clients suffering from substance use disorders were followed, that adequate training and adequate staff was provided to ensure the safety of its residence like Mr. Cartwright. Healthright 360 was engaged in operating a 24-hour residential detoxification and sober living facilities at all times and was directly responsible for providing custodial care for Decedent CARTRIGHT, starting from December 28, 2023 to January 25, 2024.

5.  At all times mentioned herein, Healthright 360 was, and still is, regulated by the California Department of Alcohol and Drug Programs and classified as a non-medical services facility because it provides no medical or incidental medical services per its classification with the State of California Department of Alcohol and Drug Programs.

6.  Upon information and belief, defendant Healthright 360's basic services it provides to residents, including Decedent herein, consisted of detoxification services, sober living, morning meditation, 12-step meetings, referrals to hospitals for detoxification, individual therapy sessions, staffing reviews, dental appointments, transportation for emergency medical treatment, and other transportation for medical reasons.

7.  At all times herein, Defendants were responsible for the care and custody of CARTWRIGHT when each of the events alleged herein occurred. It is alleged that the acts of the Defendants and their officers, directors, key facility management, staff, agents, and employees were a substantial factor in causing the death of CARTWRIGHT while a resident at Healthright 360's facility.

8. At all times when the wrongful acts alleged herein below were committed, Decedent CARTWRIGHT was a resident under the direct custodial care of Healthright 360 and its Chief Executive Director, EISEN and was at all relevant times a "Dependent Adult" as that term is defined in the Welf & Inst. Code §15610.23(g), in that he was a person between the ages of 18 and 64 years who was admitted as an inpatient to a 24-hour health facility as defined in §1250, §1250.1 and §1250.3 of the Health and Safety Code, with the facility providing 24-hour residential detoxification care for the Decedent, who had an drug dependency.

9. At all times mentioned herein, Healthright 360 had a written policy that a resident who had relapsed by using illegal drugs or alcohol would be discharged if the relapse includes drugs brought into the facility, selling or trading drugs with their peers, or eroding the safety of the environment.

10. Despite having a separate written relapse policy stating that resident would be subject to random drug and alcohol testing and property searches and that drug testing "will be administered to resident who are suspected of using illegal drugs or alcohol" Healthright 360 and its employees did not regularly conduct such testing and were negligent in failing to do so, as a reasonable drug and alcohol rehabilitation and residential treatment center would have.

11. Defendant DOE ONE, hereinafter referred to as "DOE ONE", at all times relevant to this complaint, was an employee of Healthright 360 and acting within his scope of employment as a Walden House operational manager.

12. Defendant Doe TWO, hereinafter referred to as "DOES TWO", at all times relevant to this complaint, were employees of Healthright 360 and were acting within his scope of employment as Walden house staff responsible for conducting hourly welfare checks at all times relevant to this complaint.

13. At all times relevant to this action, the wrongful acts alleged herein constituted "neglect" as that term is defined in Welf. & Inst. Code sect. 15610.57(a)(1), in that Healthright 360 negligently failed to exercise that degree of care that a reasonable person in a like position would have exercised while it had the care and/or custody of the Decedent.

14. Plaintiff brings this action against defendants, Healthright 360, EISEN, DOES 1 through 20 and for monetary damages to redress for the decedent's injuries and death resulting from

Defendants' negligent and reckless conduct in managing and operating its detox and residential treatment facilities warranting punitive damages. Plaintiff brings this action under California state law for injuries and death suffered as a result of the Defendants' substantial and deliberate indifference to Decedent's health and welfare while in their care and custody.

15. At all times mentioned herein, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

16. At all relevant times to this complaint, each individual named defendants was acting within the scope of employment with their respective employers and entity defendants, and as such, each and every entity defendant is vicariously responsible for the individually named defendant employees' acts and conduct committed during the scope of employment.

## JURISDICTION AND VENUE

17. Jurisdiction is proper in the Superior Court of the State of California for the County of San Francisco because Defendants Properly joined herein reside in that county and because Defendants do business in that county.

18. Venue is proper in this Court pursuant to Section 395 of the California Code of civil Procedure.

## FACTUAL ALLEGATIONS

19. At all times relevant to this complaint, the decedent, Justin Cartright, was a 30-year-old man of who was homeless and suffering from co-morbid conditions including substance use disorder. Mr. Cartright had been living in the streets with his girlfriend and two dogs while battling substance addiction and had just been released from the Madera County Jail in December of 2023 after serving 3 months.

20. Plaintiff Dawn Poole, once apprised of her son's release, offered to help him by having him say with her and offered him a job working at her husband's airport parking business in their hometown in Dublin, Ireland. However, as a condition of her offer, she required her son to go through a drug residential treatment and rehab prior to flying over to Ireland. CARTWRIGHT agreed and went straight to Healthright 360 as it was the predominant substance use residential treatment and rehab programs in San Francisco.

21. On December 28, 2023, CARTWRIGHT applied and was approved into the Healthright 360's residential treatment program.

22. Based on his intake screening form, CARTWRIGHT was deemed "highly vulnerable" to relapse on substances and was placed on the program's highest of detoxification program called "Clinically Managed High-Intensity Residential Treatment". While at Healthright 360's Integrated Care Center Clinic, he was noted to have Marijuana use disorder, Methamphetamine and Opioid use disorder, Severe in remissions. Dr. Jacintho assesses him to "at high risk for Fentanyl Relapse as his last use was in September, *even in the setting of Detox and Rehab*". He orders "drug Monitoring, Fentanyl, with confirmation, Urine" and Narcan nasal spray with instructions to "Spray into the nostril as needed for opioid reversal Spray into nostril in case of overdose. Repeat if needed. Call 911 for indications: decrease in rate and depth of breathing due to opioid drug.

23. On or about December 29, 2023, while at the Walden house, which is supposed to be a detox and residential treatment, CARTWRIGHT overdosed on Fentanyl the Walden house requiring the administration of four [1]Narcan to revive him. CARTWRIGHT indicates he relapsed on drugs that were not his but which were found lying around the facilities' bathroom stall. He was subsequently taken to the Hospital UCSF and medically cleared.

24. However, Healthright 360 never took any corrective measures to ensure drugs left behind in plain view inside the facilities' bathrooms were confiscated and reported to management. Healthright 360 further failed to follow its own procedures despite Decedent's obvious relapse and that of many others as indicated below, and in the face of clear signs of contraband and drug left in plain view to residents highly vulnerable to relapse. This was both a violation of a drug confiscation policy and a search and seizure policy. Healthright 360 did not even bother to investigate how drugs left inside the bathroom came to make its way inside the premise. Nor were any of the nearby residents questioned about drug possession.

---

[1] Narcan is an opiate antagonist which functions to rapidly reverse any fentanyl overdose, reversing respiratory depression and low heart rate.

25. This laissez-fair wholly indifferent approach of Healthright 360 yielded tragic consequence to the Decedent who would suffer from two more relapses until his death as indicated below.

26. On January 7th, 2024, CARTWRIGHT relapsed for a second time while at the facility and reported tested positive for Fentanyl, Methamphetamine and cocaine.

27. However, on January 10th, CARTWRIGHT was transferred from "WM" (withdrawal management) Services to Healthright 360's Residential Treatment or the "Walden House" with less supervision despite having relapsed just three days ago and required continued withdrawal management and a greater level of monitoring.

28. CARTWRIGHT's primary counsel, Michell Tebbs deemed him suitable for residential treatment despite having access to his chart indicating a fentanyl overdose on 12/29 and a relapse on 1/7 while at the Walden house. Tebbs specifically assessed and recommends a treatment level of care as Level 3.5" the high level for clinically managed High Intensity Resident Services. Despite stepping him down to residential treatment, she assesses him as "highly vulnerable and likely to continue using in a dangerous manner if not admitted to RTX due to longer term poly substances use, recent OD and history of over 20 DOD, recent return to use in program, caving to sue, no insight into concreate triggers to sue, loss of family support and ambivalence about treatment".

29. Just five days later or on January 14th, CARTWRIGHT relapses a third time yet his body is not discovered until the next morning *in full rigor* and *liver mortis*. Employees including DOES 1-20 found him on January 15 at approximately 8:00 a.m. "unresponsive", with his legs underneath him, face-down in a bent over and prone position. His body was evidently in an unusual position for a long time prior to being discovered, with notable red fluids including blood stains in the bedding in front of his body and on his face. The red fluids appeared to be purge from the nose and mouth, and is consistent with organ and tissue breakdown that takes place numerous hours after a person dies.

30. According to the coroner's investigator, both rigor and livor mortis was noted in the dependent regions of the body and in CARTWRIGHT face which is consistent with the position he came to rest once he passed away. Livor mortis could not be blanched with firm pressure,

and Rigor morts was evidence in the upper extremities and was passing on the lower extremities. He was cool to the touch.

31. The investigator also discovered evidence of drug paraphernalia in plain view next to his body along with burned foil and a baggie with white powder.

32. According to DOES 1-20, he was last known to be alive at 6:00 p.m. the night prior and there is no evidence that any welfare checks required per Healthright 360's monitoring policies were conducted until 8:00 a.m. the next day when CARTWRIGHT had long expired.

33. Justin Cartwright was 30 years old when he passed away.

## HEALTHRIGHT 360'S HISTORY OF NEGLECT

34. From March 2023 through April 2024, four clients of Healthright 360 and one of its employees fatally overdosed inside their San Francisco facilities. Despite, promoting itself as a safe and stable environment for person's addicted to substances to detoxify from drug and alcohol, the number of fatalities within a 13-month period is a stark contrast to Healthright 360's proclamation.

35. According to interviews by the San Francisco Chronicle, the facilities including the Walden house are nothing more than revolving doors for clients who often cycle between the streets and the programs. The facilities, including the Walden house was notorious for being a place where drug use was knowingly rampant by both clients and staff, who were supposedly in charge of monitoring and caring for a vulnerable population. The Walden house was also known to be a "flop house" where clients would openly consume drugs for weeks at a time, all under the guise of being treated for substance addiction.

36. Upon information and belief, the state of California also initiated its own investigation into the numerous overdose fatalities and came to the conclusion that many key policies intended on protecting clients and safekeeping of the programs were ignored and not followed. For example, policies intended on keeping drugs and alcohol out of the programs were seldom enforced. Drug testing and searches of clients and their belongings at intake, including vital hourly monitoring policies were blatantly ignored.

37. The state department further discovered that although Healthright 360 received funding from the state to the tune of $65,000,000, it failed to provide many state requirements to newly

admitted clients such as orientations by detox staff or explain the program rules.  Further, although the Walden house promotes itself as a program that fully integrates itself with mental health and residential treatment, its residential treatment went without any on-site therapist for years.

38. According to Healthright 360 client interviews by the Chronicle, many clients were observed in a drug-induced sleep, found paraphernalia and alcohol bottles and witnesses fellow client revived with Narcan, an opiate antagonist which functions to reverse a fentanyl or opiate overdose.  Apparently, drug use at the facility was so prevalent that client overdoses were a common occurrence. Because the state department only requires the reporting of overdose related deaths,  it is uncertain how well or even what the actual number of non-fatal overdose events would be.

39. According to Ben Campofreda, a former client who was interviewed by the Chronicle, he personally underwent a residential treatment program from late 2022 to early 2024, and witnessed prevalent drug and alcohol use inside Healthright 360's sober living on Haight Street. His roommate was so inebriated that he was "black-out" drunk for a week and a half, yet, staff never terminated him from the program, reprimanded or even confronted him. There are clear rules and policies which condemns any drug and alcohol use and warns clients who engage in active drug use that they can be terminated if caught, however, the reality of the matter was, these rules were never enforced by staff or anyone else: "Everybody in the whole house knew, including the staff, and nobody was doing anything…There was no accountability, and there were no repercussions", said Campofreda. According to Campofreda, most of the clients being treated at Healthright 360 needed more structure, guidance and rules than what was provided at the facility. Campofreda also noted an important but known flaw inHealthright 360's system which was Healthright 360's blatant failure to ensure clients were actually detoxified and sober prior to downgrading them from residential treatment to sober living. There was no enforceable system in place to ensure that clients who either were actively detoxifying, withdrawing from drugs or just relapsed while in detox would restart another period of detoxifying or drug tested to ensure they had actually sobered up and were clean prior to being transferred to a less restrictive environment. This was a dangerous practice because clients who were still highly

susceptible to relapsing, were more likely to overdose since their body had diminished tolerance to the drugs they were accustomed to consuming. When combined with the non-existent monitoring practices of Healthright 360's, it created a dangerous milieu where clients would fatally overdose due known shortcomings by Healthright 360 of their own policies, which went unchecked from many years.

40. According to California state requirements of Drug and Residential treatment facilities to maintain and drug and alcohol-free environment, drug relapses are a common event for an addict who stops taking the substance while attempting to become sober.

41. Despite drug relapses being a common occurrence, something Healthright360 was well-aware, seldom were safety measures followed to ensure that that the clients are safely stepped down from residential treatment were seldom followed. Neither were policies to keep drugs out of the facility enforced, hence allowing for drugs to freely enter the residential treatment facilities. According to former clients, they were seldom searched for contraband and drugs when exiting and re-entering the facilities. According to another Chronicle interview of Jillian Hitch, she and her son who were participating in a residential treatment program was able to bring Fentanyl with her inside the facility and use drugs openly for a period of two-weeks without any staff confronting her. Neither was Hitch drug tested nor drug searched when she entered the program.

42. According to a Kyle Ahlers, a recovery coach at Healthright 360, the program's response to drug use on site and relapse was "totally uneven…sometimes the person who was using and causing a ruckus would get kicked out, sometimes they would get sent back to detox, sometimes they'd have to write a paper, and sometimes nothing would happen" …"it didn't make sense, and it was really upsetting to clients, because there was no yardstick".

### FIRST CAUSE OF ACTION

### WRONGFUL DEATH

**(Against DefendantsHealthright360, EISEN and DOES 1-20)**

43. Plaintiff re-alleges and incorporate each and every allegation as contained in paragraphs 1 through 42, inclusive, of this complaint, and incorporate the same herein by reference as though set forth at length.

44. Defendants, and each of them, so negligently, carelessly, and recklessly owned, operated, maintained, supervised, and managedHealthright360, and its affiliated facilities inclusive of the Wadlen house, causing CARTWRIGHT substantial injury and his ensuing death.

45. Defendants owed a duty of care to Decedent CARTWRIGHT to reasonably ensure his safety, to be reasonably monitored, to keep drugs out of the facility, to ensure random drug testing was conducted, to ensure regular drug testing was conducting to ensure that residents were not using drugs or bringing drugs into the facility where other residents could use drugs, and to ensure residents underwent adequate detoxification both in term of duration and substance of the protocol, to minimize the risk of relapse while under their care and custody.

46. Defendants not only owed a duty of care to Decedent to not only regularly test for drugs but also to conduct random searches of residents and their personal property, to ensure that other residents within their residential detox facility were not bringing substances into the facility and providing those controlled substances to residents, and/or leaving paraphernalia and illicit drugs left in plain site within the facility including inside its bathrooms. Defendants owed a duty to keep those controlled substances out of the facility whether or not those substances were narcotics that residents had already been addicted to and undergoing detoxification for, or whether those narcotics were something the resident had not recently used but were introduced to by other residents of the detox facility.

47. Defendants further owed a duty of care to Decedent to discharge from Healthright 360 residents who did not follow the rules, who tested positive for drugs, or who became a threat to the health and safety of other residents.

48. Defendants breached their duty of care by negligently, wrongfully, and /or unlawfully engaging in the acts and/or omissions detailed above, including without limitation, failing to regularly drug test/drug screen residents, by failing to conduct regular hourly welfare check and to ensure such checks were documented especially during the evening hours, by allowing new residents to enter the facility without adequately screening the new residents to ensure they would not be a danger or threat to the health or safety of new and existing residents, by failing

to discharge residents from the facility for violations of the rules and/or for positive drug testing, for failing to enforce rules prohibiting the introduction of drugs into the facility, by failing to conduct searches of person and personal property, thereby allowing residents to bring drugs and other controlled substances into the facility, by failing to ensure Decedent was properly detoxified from his substance addiction, in light of having relapsed twice within a period of less than ten (10) days, by further failing to ensure Decedent was sober prior to stepping down his residential treatment to a rehab, by failing to monitor Decedent and failing to follow their own relapse and dismissal policies.

49. Defendants' negligence was a substantial factor in causing the Decedent's death.

50. That as a direct and proximate result of the acts and omissions of the Defendants, and each of them, and the injuries resulting therefrom, Plaintiff has sustained substantial economic and non-economic damages as a result of the Decedents' death. Plaintiff's economic damages including funeral and burial expenses. Non-economic damages include but not limited to Loss of her son's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

51. As a further, direct and legal result of said negligence, carelessness and unskillfulness of the Defendants, and each of them, Plaintiff is entitled to recover prejudgment interest under California Code of Civil Procedure §998 and California Civil Code §3291.

## SECOND CAUSE OF ACTION

**NEGLECT OF A DEPENDENT ADULT IN VIOLATION OF**

**W&I §§ 15610.57 & 15657 (Against Defendants Healthright 360, EISEN and DOES 1-20)**

52. Plaintiff re-alleges each and every allegation as contained in paragraphs 1 through 51, inclusive, of this complaint, and incorporate the same herein by reference as though set forth at length.

53. At all times relevant to this complaint, defendants Healthright 360, EISEN and DOES 1-20 assumed substantial caretaking and custodial relationship with CARTWRIGHT with ongoing responsibilities to ensure not to endanger his health and safety.

54. At all times relevant to this complaint, defendants Healthright 360, EISEN and DOES 1-20 had custody and care of CARTWRIGHT.

55. At all times relevant to this complaint, defendants Decedent CARTWRIGHT was a resident under the direct custodial care of Defendants and was at all relevant times a "dependent adult" as that term is defined in W&I Code §15610.3(b), in that he was a person between 18 and 64 admitted as an inpatient to a 24 hour health facility, as defined by §§ 1250, 1250.1 and 1250.3 of the H&S code, with the facility providing 24 hour residential detox care for the Decedent, who had alcohol and drug dependency.

56. At all times relevant to this complaint, the wrongful acts alleged herein constituted "neglect" as that erm is defined in W&I §15610.51(a)(1), in that Defendants negligently failed to exercise that degree of care that a reasonable person in a like position would have exercised while it had the care and/or custody of the Decedent.

57. As set forth above, Defendants engaged, to a clear and convincing degree, in reckless and oppressive malfeasance, which was a substantial factor in causing the Decedent's death. Defendants acted with deliberate disregard to the high degree of probability that Decedents' death would occur. Further, Defendants' conduct involved intentional, willful and conscious wrongdoing of a despicable and injurious nature.

58. As a result of Defendants' conduct, CARTWRIGHT and Plaintiff were harmed.

59. Defendants' conduct was a substantial factor in causing CARTWRIGHT's harm and ultimate death.

60. That as a direct and proximate result of the acts and omissions of the Defendants, and each of them, and the injuries resulting therefrom, Plaintiff has sustained substantial economic and non-economic damages as a result of the Decedents' death. Plaintiff's economic damages including funeral and burial expenses. Non-economic damages include but not limited to Loss of her son's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

61. Because defendants At all times relevant to this complaint acted with recklessness, oppression and fraud in neglecting CARTWRIGHT, Plaintiff will be seeking enhanced

remedies under W&I Code section 15657 seeking to recover attorney's fees and costs as well for damages for Decedent's pre-death pain and suffering.

### THIRD CAUSE OF ACTION

### NEGLIGENT TRAINING, SUPERVISION, AND RETENTION

**(Against Defendants Healthright 360, EISEN and DOES 1-20)**

62. Plaintiff re-alleges each and every allegation as contained in paragraphs 1 through 61, inclusive, of this complaint, and incorporate the same herein by reference as though set forth at length.

63. Upon information and belief, Defendants Healthright 360, EISEN, and DOES 1-20, and each of them, by and through their agents, subcontractors, and employees, knew or reasonably should have known of the propensities of Defendants Healthright 360, EISEN, and DOES 1-20, for wrongful, dangerous, and deliberately indifferent conduct, and that said Defendants Healthright 360, EISEN, and DOES 1-20, had been poorly and improperly trained in their duties, lacked sufficient experience to be entrusted with the duties of performing the same, and knew or in the exercise of due care reasonably should have known that entrusting said Defendants to perform such duties were substantially certain to result in serious and substantial injury and/or damage to members of the public including Plaintiff and Decedent.

64. At all times herein mentioned, the Defendants Healthright 360, EISEN, and DOES 1-20, and other employees, agents, and other representatives, given their wrongful, dangerous, and exploitive propensities, lack of skill, training and experience, and to provide reasonable supervision of said employees and/or agents.

65. Despite defendant EISEN's proclaimed statement that Healthright 360 is "not a supervised consumption facility" or that their residential treatment programs is supposed to be an "abstinence-based" program, the lack of any meaningful oversight and supervision makes this self-proclaimed statement a fallacy.

66. Specifically, defendant provided inadequate training, supervision and retention of the staff responsible for monitoring, conducting welfare check, enforcing drug relapse policy, enforcing random drug testing, and regular drug testing, downgrading residential treatment residents to rehab. Additionally, upon information and belief, Healthright 360 administrators

1  including EISEN and DOES 1-20 were responsible themselves for managing, operating and
2  supervising other staff at the Healthright 360 facility.

3  67.  Defendant Healthright 360 as a licensed drug and alcohol residential treatment facility with the State of California, had reporting obligation to report resident overdoses at their facility. However, non-fatal overdoses, although not required to be reported are documented by Healthright 360 and directly places it on notice of its lack of supervision and oversight which directly resulted into the numerous violations as indicated above.

68.  The Defendants Healthright 360, EISEN, and DOES 1-20 and each of them, negligently retained and/or failed to supervise Defendants Healthright 360, EISEN, and DOES 1-20 and other employees, agents, and other representatives, in their position of trust and authority and were able to commit the wrongful acts complained of herein against Plaintiff. Defendants Healthright 360, EISEN, and DOES 1-20, and each of them, negligently failed to provide reasonable supervision of their employees and agents.

69.  As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered, and continue to suffer, injuries including severe anxiety, humiliation, embarrassment, great pain of mind and body, shock, loss of self-esteem, disgrace, loss of enjoyment of life, and other severe mental and emotional distress, loss of earnings and earning capacity, and damage to her reputation. Plaintiff has therefore entitled to general and compensatory damages in a sum in excess of the minimum jurisdiction of the court and according to proof at trial.

70.  Defendants Healthright 360, EISEN, and DOES 1-20 engaged in the acts alleged herein and/or condoned, permitted, authorized, directed, approved, and/or ratified the conduct of their employees, subcontractors, and agents, and are therefore vicariously liable for the wrongful conduct of their employees, subcontractors, and agents for this cause of action.

71.  Plaintiff is further entitled to incidental and consequential damages, plus pre- judgment interest at the prevailing legal rate pursuant to California Civil Code §3287 or any other provision of law providing for prejudgment interest, all in a sum according to proof at time of trial.

## FOURTH CAUSE OF ACTION

**SURVIVAL PER CCP §377.30 et seq.**

**(Against Defendants Healthright 360, EISEN and DOES 1-20)**

72. Plaintiff re-allege each and every allegation as contained in paragraphs 1 through 71, inclusive, of this complaint, and incorporate the same herein by reference as though set forth at length.

73. As set forth above, Defendants owed a duty of care to the Decedent to reasonably ensure his safety, to protect him from other residents bringing drugs and leaving them behind in common areas of the facility, to properly drug test and detox Decedent if drugs were found in his system, to ensure that actions were taken for his protection following obvious signs of intoxication and being under the influence, and known signs of other residents being heavily intoxicated and under the influence of opiates within the facility.

74. Defendants breached that duty of care by negligently, wrongfully, and/or unlawfully engaging in the acts and/or omissions detailed above.

75. Defendants' negligence was a substantial factor in causing the Decedent's death.

76. Plaintiff G.M.P., as successor-in-interest to the estate of DECEDENT, brings this claim to recover the loss and/or damages, including, without limitation, emotional distress, pain and suffering, and anxiety, that the Decedent suffered or incurred before his death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had he survived.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff request entry of judgment in their favor and against all Defendants, and DOES 1 through 20 inclusive, as follows:

a. For general and special damages according to proof;

b. For punitive damages against the individual and entity defendants in an amount to be proven at trial;

c. For interest;

d. For reasonable costs of this suit and attorney's fees per W&I §15657

e. For such further other relief as the Court may deem just, proper, and appropriate.

Date: July 30, 2025            THE SEHAT LAW FIRM, PLC


                               */s/ Jeffrey Mikel*
                               Attorney for Plaintiff